UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

GEICO MARINE INSURANCE
COMPANY, a Maryland
Corporation,

    Plaintiff,

v.                                                                                 Case No.:   2:21-cv-829-SPC-KCD

AMZIM MARINE SERVICES,
LLC,

    Defendant.
_____/

## OPINION AND ORDER

This case is before the Court upon conclusion of a bench trial.  The Court received testimony and exhibits in evidence during trial, and the Court has also received proposed findings of fact and conclusions of law from all parties.  (Doc. 119, 120, 121).  The Court now makes its findings of fact and conclusions of law in this maritime negligence case.

Two statements during closing arguments capture the evidentiary character of this case.  First, Intervenor Plaintiff's counsel requested "the miracle of resolution in their favor in these final moments."  (Doc. 114 at 174).  Second, Plaintiff's counsel boldly announced that "there are many issues in this case that we just don't know."  (Doc. 114 at 193).  It is not in the nature of

burdens of proof to accommodate miracles, so the Court cannot grant Plaintiffs the miracle they are looking for.

## Findings of Fact

In 2017, Intervenor Plaintiff Gregory Shand ("Shand") bought a new 40-foot boat from Formula Boats South for "just shy of $600,000."[1] (Doc. 112 at 50). Shand insured the boat with GEICO Marine Insurance Company ("GEICO")[2] for $600,000. (Doc. 112 at 52). He named her SVAHA.

SVAHA led a troubled life. In the same year of her purchase, SVAHA's portside trim tab was replaced by Amzim Marine Services, LLC ("Amzim"), a marine repair business. (Doc. 112 at 110). This same trim tab was replaced again in 2019 by Amzim. (Doc. 112 at 110; Doc. 114 at 111).[3] SVAHA suffered walls moving, ceilings buckling, cabinetry shifting, and a reoccurring interior crack whenever she was taken out onto the water. (Doc. 112 at 114). Shand was "not very happy" with his purchase. (Doc. 112 at 113).

Shand sent SVAHA to the manufacturer (Formula Boats) in September 2019 for evaluation and repair, and he provided Formula with a list of thirteen

---

[1] Shand testified to buying the boat for "just shy of $600,000" without further clarification. Shand Exhibit 29 indicates that "just shy of $600,000" means "$573,600."
[2] Shand did not testify directly to the fact that he insured SVAHA with GEICO. But Shand responded to questions from counsel such as "how much money did you receive from GEICO?" and "in regards to even your insurance policy with GEICO, you didn't have to have a separate paid captain to operate?" (Doc. 112 at 56, 101). Additionally, Amzim Exhibit 22, a settlement letter concerning SVAHA, is from Plaintiff "GEICO Marine Insurance Company."
[3] In Mike Boyd's deposition, excerpts of which were admitted at trial, he stated that the portside interceptor was replaced three times—2017, 2018, and 2019. (Boyd Depo, 9).

items he wanted addressed. (Doc. 112 at 115, 117). One item was the repeated failure of the portside trim tab. (Doc. 112 at 115). But Formula took too long to make the repairs, and Shand asked to have SVAHA returned to him. (Doc. 112 at 112). Shand was notified in November 2019 that SVAHA had been returned to Florida and was ready for pick up. (Doc. 112 at 115, 148, 170).

A few days before Shand retrieved SVAHA, Amzim employee Zachary Haley installed SVAHA's portside interceptor at Formula's request.[4] (Doc. 113 at 7; Doc. 114 at 29-31; Boyd Depo, 41). The interceptor he installed was provided to him by Formula, and it was a factory part. (Boyd Depo, 19). Haley did not reference the Volvo Penta QL Boat Trim System manual ("Volvo manual") before installation, but he had installed many interceptors before and this specific interceptor over ten times. (Doc. 113 at 7). The Volvo manual instructs that 3M 4200 Marine Adhesive Sealant[5] be applied to "the interceptor neck as well as around each of the screw holes." (Shand Ex. 2, Fig. 19). It also specifies that "pneumatic or electric tools" should not be used during installation because their use could result in over-tightening and damage to the interceptor unit. (Shand Ex. 2, Fig. 19).

---

[4] Throughout trial, counsel and several witnesses referred to the "trim tab" and "interceptor" interchangeably. They are not, however, interchangeable. The interceptor is a component of the overall trim tab system. (Shand Ex. 2, Fig. 1).
[5] The manual lists other types of acceptable sealants, but all the testimony here concerned the 3M 4200. (Shand Ex. 2, Fig. 19).

Haley did not follow the manual, but applied sealant to the transom, the screws, and "around the boot area." (Doc. 113 at 11, 16). He also installed the screws with a battery-operated screwdriver. (Doc. 113 at 58-59; Doc. 114 at 123). This was how he had been taught to install interceptors by Gary Tantum,[6] who testified that it is much cleaner to install the interceptor that way and there is no practical difference. (Doc. 114 at 53, 126-27). The parties dispute whether appropriate sealant was used for the installation. The invoice for the work lists "MARINE FAST CURE 4200 SEALANT," which is 3M 4200. (Amzim Ex. 25). At trial, Haley testified he used 3M 4200.[7] (Doc. 113 at 81-82).

After her new interceptor was installed by Haley, SVAHA made two successful voyages before sinking in January 2020. Her first post-installation voyage was a five-day trip in December 2019 from Fort Myers to Miami. (Doc. 112 at 124). Shand drove the boat from Fort Myers down to Marathon and back up to Miami—about nine hours of runtime one-way. (Doc. 112 at 124). During this trip, SVAHA's trim tab system was operational, and she did not

---

[6] Gary Tantum was introduced by counsel as "principal of [Amzim] and company representatives." (Doc. 112 at 14). There was no testimony on this point, but it appears uncontested. Intervening Plaintiff's counsel remarked during a meandering direct examination question "I think we know who Gary Tantum is, he's been introduced as the principal of Amzim." (Doc. 112 at 63). It is clear from the record that Gary Tantum started Amzim. (Doc. 114 at 6-7).

[7] To complicate matters, counsel objected sometimes (but not all the time) to certain prior statements by Haley coming into evidence— a statement that he used silicone sealant rather than 3M 4200. Haley's hearsay statement was ultimately considered by the Court because counsel did not object when Patrick Bihary testified to it. (Doc. 112 at 202).

4

take on water. (Doc. 112 at 125, 127). SVAHA was docked in Miami for four or five days, and each day Shand and his wife slept onboard without incident. (Doc. 112 at 125). SVAHA returned to Fort Myers without incident and was placed on a boat lift. (Doc. 112 at 128).

SVAHA's second post-installation voyage was from Fort Myers to Naples in January 2020. (Doc. 112 at 123-124). During the initial leg of the trip—about an hour and a half of runtime—SVAHA's trim tab system was operational, and she did not take on water. (Doc. 112 at 124-25). But after SVAHA was docked in Naples and Shand and his wife had gone to sleep, SVAHA took on water. (Doc. 112 at 132). SVAHA's high water alarm did not sound, and her bilge pumps were not operating properly. (Doc. 112 at 50, 132, 300-301; Doc. 113 at 151). The Court does not have detailed information about the height of the water intrusion.[8]

Sea Tow and the fire department arrived on scene. (Doc. 112 at 141, 151, 174). Identifying the source of the water intrusion, Sea Tow pulled out the trim tab cables, plugged the hole with putty, and pumped the water from SVAHA. (Doc. 112 at 179, 77-78; Doc. 114 at 56). Gary Tantum arrived on

---

[8] The evidence on this topic consisted of vague references to "several inches of water" (GEICO Ex. 1), photos of the high-water line with no scale (GEICO Ex. 2), and testimony that there was enough water to have triggered the high-water alarm (Doc. 112 at 291; Doc. 113 at 210). One blurry photo located by the Court—which was admitted as part of a bulk batch of photos with no explanatory testimony—suggests that the high-water line was about thirteen inches (Amzim Ex. 34).

5

scene. (Doc. 114 at 54-55, 63). SVAHA was removed from the water and sat at Molly's Marine overnight until she was put back in the water and moved elsewhere. (Doc. 112 at 151; Doc. 114 at 59-61, 64-66).

A few days after the sinking, Gary Tantum visited SVAHA, and he took oil samples from her engines. (Doc. 114 at 62, 107). He also tried to start the engines to see if they had water in them. (Doc. 114 at 63, 67). The portside engine started; the starboard engine did not. (Doc. 114 at 63, 159).[9]

SVAHA's first survey was completed five days after she sank. (Doc. 112 at 56; Doc. 114 at 70). Then a second survey was done five months later. (Doc. 112 at 56). During the first survey, Gary Tantum removed both the port and starboard interceptors. (Doc. 114 at 74-75). The port interceptor showed significantly less sealant and sealant residue than the starboard interceptor. And on the port side, the trim tab boot was broken, and the flange was missing. (Doc. 114 at 154; Doc. 112 at 230, 263-64).

Shand did not repair SVAHA, nor did he pickle her engines. (Doc. 112 at 60, 152, 161). He declined even though Gary Tantum—and in a way,

---

[9] Shand testified that the engine could not have been started because "[t]he impeller . . . is shown to be in good condition." (Doc. 112 at 104). But Shand was not qualified as an expert in mechanical marine operations; in fact, much of his testimony—such as the fact that he did not know there was more than one bilge pump on his boat—suggests quite the opposite. It appears he parroted this language from Scott Virgin, who discussed impellers and said that "it was the opinion of the Volvo people and myself when we looked at it that the motors couldn't have been run in that condition." (Doc. 112 at 270). But Virgin's opinion was based on his observations from the second survey, which occurred five months after SVAHA sank.

6

GEICO—told him SVAHA was repairable.[10]  (Doc. 112 at 160; Doc. 114 at 68). SVAHA sat without maintenance or cleaning for months.[11]  (Doc. 114 at 85, 97, 172).  Shand reached out to yacht brokers who were not interested in SVAHA because she was totaled.  (Doc. 112 at 59).[12]  After receiving three offers for sale—$18,000, $19,000, and $59,000—Shand sold SVAHA in October 2020 for $59,000.  (Doc. 112 at 59, 161).  After his $6,000 deductible, Shand received about $259,000 for SVAHA from GEICO.  (Doc. 112 at 61).

GEICO sued Amzim in admiralty for negligence.  GEICO's complaint alleges that "[i]n the course of the repairs, Defendant caused damage to the vessel, including, but not limited to failing to ensure the exhaust hose was plugged."  (Doc. 1 at 3).  The Court heard no testimony about failure to plug an exhaust hose.

Shand intervened in the suit, also claiming negligence.  Unlike GEICO's complaint, Shand's intervenor complaint cites topical issues.  It alleges that

---

[10] GEICO's letter informed Shand he would be compensated for less than 50% of the purchase value of the boat.  Shand admitted on cross-examination that because of that, he thinks GEICO considered SVAHA to be repairable.  (Doc. 112 at 160).

[11] This is despite the following April 15, 2020, email from the elusive Jim Jones (who is somehow related to Amzim's insurer): "Since time keeps moving on while we are standing by and patiently waiting to be allowed to complete our investigation, we are obliged to remind you that the condition of the damage that has been alleged so far must be preserved for our access and investigation. Obviously, any necessary vessel preservation and mitigation efforts must be undertaken as you see fit as the vessel owner, but no work or repairs should be completed on your vessel which may alter or destroy evidence that we have a right to fully investigate once the current restrictions and your current prohibition against our access are lifted." (Amzim Ex. 25; Doc. 112 at 42-43, 57-58; Doc. 114 at 94).

[12] Shand testified on direct that he reached out to yacht brokers, then testified on cross that he did not explore having a *salvage* broker put SVAHA on the market.  (Doc. 112 at 162).

"Defendant was negligent by damaging the boot and screws, failing to notice the missing flange, failing to connect the high-water alarm wire, failing to detect the malfunctioning bilge pump, and/or failing to properly install the trim tab." (Doc. 23 at 4).

The Court heard a lot of testimony about boots, screws, flanges, bilge pumps, high-water alarms, and interceptor installations. Much of it was irrelevant. The broken boot, sheared screws, and missing flange all seem to be red herrings, dumped in the Court's lap as "things that might have gone wrong." The boot was broken by first responders, was not causally related to SVAHA's sinking, and was not installed or otherwise manipulated by Haley.[13] Several witnesses testified about sheared screws—but these screws were not causally related to SVAHA's sinking and were not installed by Haley. (Doc. 112 at 290-91, 295; Doc. 114 at 78). And finally, no one knows what happened to the flange, but working on the flange was not within the scope of Haley's installation of the interceptor. (Doc. 112 at 259, 263; Doc. 113 at 123, 171; Doc. 114 at 79). This leaves us with the actual issue: Haley's installation of the interceptor.

---

[13] Bihary said that the boot and flange are not relevant to SVAHA's sinking and that the boot and flange were likely ripped out by Sea Tow. (Doc. 112 at 233-34). Virgin agreed that the boot has nothing to do with keeping seawater out of the boat and that it was torn out by Sea Tow or the fire department. (Doc. 112 at 260-61, 266, 291-92). And no one disputes that the boot was in place before Haley installed the interceptor. (Doc. 113 at 13).

## Conclusions of Law

"Drawn from state and federal sources, the general maritime law is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules." *E. River S.S. Corp. v. Transamerica Delaval*, 476 U.S. 858 (1986). A contract to repair a vessel is maritime in nature. *F.W.F., Inc. v. Detroit Diesel Corp.,* 494 F. Supp. 2d 1342, 1352 (S.D. Fla. 2007) (internal citation omitted). So this is an action within the admiralty jurisdiction of this Court under 28 U.S.C. § 1333.

To prove negligence under maritime law, a plaintiff must show that: (1) the defendant had a duty to protect the plaintiff from a particular injury, (2) the defendant breached that duty, (3) the breach actually and proximately caused the plaintiff's injury, and (4) the plaintiff suffered actual harm. *Chaparro v. Carnival Corp.,* 693 F.3d 1333, 1336 (11th Cir. 2012). "Under federal maritime law the proximate cause is the efficient cause and not a merely incidental cause which may be nearer in time to the result." *N.H. Ins. Co. v. Krilich*, 387 F. App'x 940, 942 (11th Cir. 2010) (internal citation omitted).

In the maritime repair context, a claim of implied warranty of workmanlike performance "parallels a negligence standard." *La Esperanza De P.R. v. Perez Y Cia. De P.R.*, 124 F.3d 10, 17 (1st Cir. 1997); *Arnold v. Heritage Enters. of St. Lucie LLC*, No. 13-14447-CIV, 2015 WL 10791990, at *2 (S.D. Fla. May 7, 2015). The doctrine of warranty of workmanlike performance

9

exists for every contract under general maritime law. *Vierling v. Celebrity Cruises, Inc.*, 339 F.3d 1309, 1315-16 (11th Cir. 2003).

This implied warranty obligates a repairman to perform his services with reasonable care, skill, and safety. *Vierling*, 339 F.3d at 1315 (citing *Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp.*, 350 U.S. 124, 132-35 (1956)). "The standard of the skill required is the degree of skill, efficiency, and knowledge that is possessed by those of ordinary skill, competency, and standing in the particular trade or business for which the person is employed, and where the contract does not provide for a higher degree of skill, only ordinary skill and the degree of skill adequate to the performance of the undertaking is required." 17A AM. JUR. 2D CONTRACTS § 599. "No breach will be found if the contractor performed the work in accordance with industry standards." *Id.*

A plaintiff's burden in a civil trial is by a preponderance of evidence. *See Allapattah Servs., Inc. v. Exxon Corp.*, 188 F.R.D. 667, 679 n.21 (S.D. Fla. 1999) (citations omitted). To find the plaintiff has carried its burden under the preponderance of evidence standard, the trier of fact must "believe that the existence of a fact is more probable than its nonexistence." *Concrete Pipe & Prod. of California, Inc. v. Constr. Laborers Pension Tr. for S. California*, 508 U.S. 602, 622 (1993) (quoting *In re Winship*, 397 U.S. 358, 371-372 (1970)).

## Analysis and Conclusion

Plaintiffs have failed to establish what Amzim's duty was, whether Haley breached that duty during his installation of the interceptor, whether (assuming breach) Haley's actions caused SVAHA's sinking, and what damages were incurred. Plaintiffs have failed on all four elements of negligence.

The Court did not receive persuasive evidence of the industry standard for the installation of interceptors. Plaintiffs believed the Volvo manual was conclusive, indisputable evidence of the industry standard.[14] But the trial testimony painted a much different picture. Witnesses agreed that the starboard interceptor (which was factory-installed and not touched my Amzim) *also* violated the instructions in the Volvo manual because the starboard interceptor was installed with excessive sealant. (Doc. 113 at 145-46; Doc. 112 at 311). Intervening Plaintiff's witness testified that he sees excessive sealant (violative of the Volvo manual) in "90 percent of the tabs [he] take[s] off of any manufactured boats, just not Formulas, Crew, everybody's boats that [he] work[s] on." (Doc. 112 at 235). Another witness (also Plaintiffs') added that

---

[14] As though to emphasize this point, when Bihary (Shand's witness) was asked "So, ultimately, what is your opinion relative to the role that the sealant situation on the portside of this vessel's portside trim tab, what role it played in the casualty this vessel suffered in January 26th, [20]20?" he answered, "Unfortunately, in the video, the technician states that he put silicone on the screws, which clearly the manual states to not do . . . *he didn't follow the instructions. It's that simple*." (Doc. 112 at 206) (emphasis added).

the starboard interceptor was installed with the wrong type of sealant (violative of the Volvo manual). (Doc. 112 at 311). Gary Tantum, who has installed around 100 of these interceptors since 2008, routinely installs them in a way that violates the Volvo manual. So from the information the Court has, the Volvo manual is far from the industry standard.

Based on Plaintiffs' failure to establish Amzim's duty, it is hard to find that Haley violated that duty. Assuming Amzim's duty was to install the portside trim tab in accordance with the Volvo manual, then Haley breached this duty. But assuming Amzim's duty was to install the portside trim tab in accordance with industry standards, Plaintiffs did not show that Amzim breached its duty. The Court heard a stunning volume of testimony about the amount and type of sealant that was applied and how it should have been applied. But much of that testimony came from individuals with no experience installing interceptors,[15] which casts doubt on their ability to speak to a breach of industry standards.

Plaintiffs are even further from the mark with causation. But for Haley's installation of the portside interceptor, would SVAHA have taken on water? SVAHA suffered many ailments in her short life, including several portside

---

[15] Scott Virgin has merely "assisted" in the installation of a trim tab system once and Toby Phillips has "never installed an interceptor in [his] life." (Doc. 112 at 312-13; Doc. 113 at 175). For many reasons—including his inability to state whether his method included "us[ing] [his] noodle"—the Court gives little weight to much Toby Phillips' testimony, though his observation that the interceptor itself may have been faulty has merit. (Doc. 113 at 166).

interceptor replacements by Amzim using the same Volvo-noncompliant procedure, and she had never leaked before. She also did not take on water during her first 20 hours of runtime post-installation, nor in the four or five days she sat in the water in Miami.

And the Court heard testimony that faulty screws around the flange could have contributed to the water ingress. (Doc. 112 at 290-91). It heard testimony that the flange was the source of the water intrusion. (Doc. 113 at 170). It heard testimony that the interceptor itself (as manufactured by Volvo) was faulty. (Doc. 113 at 129-30, 181). And the Volvo manual expressly warns that some preliminary installation steps—which may have been taken by Formula—will result in "insufficient sealing."[16] (Shand Ex. 2, Fig. 14). The number of issues which may have contributed to SVAHA's sinking weighs against Plaintiffs. Plaintiffs cannot carry their burden when their theory of causation depends on speculation.

---

[16] The Volvo manual says, "Be sure that the edge of the 32 mm center hole is not damaged when preparing the through-hull. If the hull is damaged, the grommet will not fit in a proper way, which may result in insufficient sealing." During his deposition, Mike Boyd admitted that he was not sure what exactly Formula did with the trim tab. "If we remove a part or are examining it and for whatever reason we take it off, we would normally put it back on. But I saw in at least one of the reports, survey reports, that they said the boat was returned without the tab installed. That would be unusual for us to do that, but I don't have any documentation, no photos or anything like that, to say either way." (Boyd Depo, 27). While it seems unlikely that Formula interfered with the grommet fitting, the fact remains that not even Formula knows what action Formula took when they had SVAHA in their custody.

Nor would SVAHA have suffered nearly as much damage if she had operational bilge pumps and a working high-water alarm.[17] But SVAHA had neither thing, letting water flow into the boat undetected and unmitigated. Tantum testified that for a boat of SVAHA's size, there should be a monthly check of all systems on the boat—which would include checking the bilge pumps.[18] (Doc. 114 at 19). But Shand did not do systems checks before taking SVAHA out on the water. (Doc. 112 at 108). Shand testified he maintained SVAHA "magnificently" and was a "stickler on maintenance"—yet only sometimes checked *one* of the two bilge pumps before he went out—and he went out on the water that day with a disconnected high-water alarm. (Doc. 112 at 54, 133-34, 305). He also could not testify to what steps he generally took before taking SVAHA out on the water, aside from making sure things were closed and secured. (Doc. 112 at 108).

And even if the Court somehow considers Haley's installation of the interceptor to be the but for cause of SVAHA's sinking, Plaintiffs' case falls apart during the damages analysis. The damages are speculative. Plaintiffs'

---

[17] Bihary said inoperable bilge pumps and high-water alarm would have "contributed to the loss." (Doc. 112 at 231). Virgin agreed that the high-water alarm—if operational—would have been triggered long before SVAHA took on the amount of water she did. (Doc. 112 at 297). And though it is disputed whether the bilge pumps—even if fully operational—could have kept up with the rate of water ingress, common sense dictates that SVAHA would have taken on less water with working pumps. (Doc. 112 at 307; Doc. 114 at 56).

[18] Virgin agreed that it is good practice for vessel owners to routinely inspect and maintain bilge pumps. (Doc. 112 at 301).

14

estimate of SVAHA's pre-sinking value is guesswork. Jason Dunbar testified that the day before the sinking, SVAHA was worth about $440,000 and her salvage value was about $59,000. (Doc. 112 at 26). Dunbar, however, did not consider SVAHA's condition before sinking. For his computation, he assumed she was in average condition and had logged an average number of hours on the water. (Doc. 112 at 37). Dunbar also ignored SVAHA's service history. (Doc. 112 at 39). And from a credibility standpoint, Dunbar was retained to provide his opinion *after* SVAHA had been sold, and he could not recall whether he had seen surveyor worksheets detailing what SVAHA required for repair. (Doc. 112 at 45).

Plaintiffs introduced a hodge-podge of damage estimates with no context, a prime example of why admitting exhibits without explanation is unhelpful. Scott Virgin prepared the Surveyor's Work Sheet that put the total to repair SVAHA at $172,464.47. (Doc. 112 at 244; GEICO Ex. 5). He also prepared another estimate, Surveyor's Work Sheet 2. (GEICO Ex. 10). This second worksheet puts the total to repair SVAHA at $265,550.13. (GEICO Ex. 10). The first estimate does not seem to include the cost of either repairing or replacing SVAHA's engines, but the second puts the cost of the engines at $148,012.36. (GEICO Ex. 5, GEICO Ex. 10).

And Advanced Diesel prepared two estimates concerning SVAHA's engines. One engine estimate puts the cost at $174,723.23, though the second

15

estimate puts it at $236,838.21. (Amzim Ex. 25). Neither Virgin nor anyone from Advanced Diesel adequately explained these documents. Virgin's second estimate makes vague references to "many items included in other estimate." (GEICO Ex. 10). This makes the math on the Surveyor's Worksheet and the Surveyor's Worksheet 2 dubious at best—what is included or not included?

Assuming those worksheets (the non-engine and the engine) should be added together, the total would be $347,187.70 if we combine the first Surveyor's Worksheet with the first Advanced Diesel estimate. It would be $409,302.68 if we combine the first Surveyor's Worksheet and the second Advanced Diesel estimate. But when asked about the total estimated loss for SVAHA, Virgin testified to the amount on Surveyor's Worksheet 2, which is $265,550.13. (Doc. 112 at 249, 315). This discrepancy was not explained.

But wait—there's more. Amzim also prepared an estimate for SVAHA's repair, totaling $137,151.86. (Amzim Ex. 26). Tantum testified that this estimate both "included a lot more than what was damaged on the boat" *and* that the estimate did not include "replacing the engines, any wiring, any bilge pumps, any batteries, any trays, any electrical components." (Doc. 114 at 82). To complicate matters, the estimate which allegedly does not include bilge pumps lists "bilge pumps" as a line item. (Amzim Ex. 26). It appears this estimate is identical to the Formula Boats South estimate, which also totals $137,151.86. (GEICO Ex. 39). So based on the two Surveyor Worksheets from

16

Virgin, the two estimates from Advanced Diesel, and the Amzim/Formula Boats South estimate—which were admitted into evidence without explanation—the Court has no idea the damage sustained by SVAHA.[19]

To recap, the Court has no reliable estimate of SVAHA's pre-sinking value. The Court also has no reliable evidence of the extent of SVAHA's damages. To further complicate matters, Shand declined to mitigate his damages. He did not pickle SVAHA's engines after the sinking, even though pickling may have saved them.[20] The testimony on the utility of picking SVAHA's engines was slightly mixed,[21] but even Plaintiffs' expert admitted there is little risk to pickling an engine and that he would not have advised Shand *not* to pickle the engines. (Doc. 112 at 265, 277). Both sides agree that Shand could have pickled the engines immediately despite the ongoing sinking investigation because the engines were not evidence in that investigation.

---

[19] The Court does have an idea, however, that Shand's damages do not include the dinghy or EPIRB. Shand claims he was never compensated for the former and that the latter "disappeared." (Doc. 112 at 166). Shand had no explanation for how the EPIRB "disappeared" and could not answer whether it was "lost or damaged in the [sinking] event." (Doc. 112 at 166-67). And he admitted that the dinghy and dinghy motor were not on board at the time of the water intrusion, a fact confirmed by photos of the boat the morning of the sinking. (Doc. 112 at 165; Amzim Ex. 32).

[20] Operational engines would have made a huge difference in SVAHA's post-sinking value. The lower of Advanced Diesel's estimates to repair SVAHA's engines was $174,723.23. But of course, the Court also doesn't know how much the pickling would have cost. Strawbridge testified that he "doesn't really get into costs and values," but knows that the cost of pickling the engines would have been significantly less than the cost of replacing them. (Doc. 113 at 219-20).

[21] Strawbridge testified that because post-sinking one engine started and the other turned over, the engines were an "excellent candidate for preservation." (Doc. 113 at 225). But Plaintiffs contest Tantum's testimony that he started or turned over the engines. (Doc. 112 at 270).

(Doc. 112 at 315; Doc. 113 at 202). And in another failure to mitigate damages, Shand let SVAHA sit without maintenance or additional cleaning for several months after her sinking (but before sale), putting her at further risk of rust and corrosion.[22] (Doc. 114 at 85, 97, 172).

Based on the foregoing findings of fact and conclusions of law, Plaintiffs GEICO and Gregory Shand did not sustain their burden of proof. Accordingly, judgment must be entered in favor of Defendant Amzim.

Accordingly, it is now

**ORDERED:**

1. Amzim is entitled to judgment in its favor on the Complaint (Doc. 1) and Intervenor Complaint (Doc. 23).

2. The Clerk is **DIRECTED** to enter judgment, terminate any pending deadlines, and close the case.

**DONE** and **ORDERED** in Fort Myers, Florida on March 12, 2024.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies: All Parties of Record

---

[22] Virgin testified that letting SVAHA sit was not a matter of consequence. (Doc. 112 at 279, 281). But this contradicts common sense, his own testimony on oxidation, and Strawbridge and Tantum's testimony. Strawbridge pointed out areas of rust in the engine room and testified that the rust was consistent with seawater sitting in an engine for five or six months following a water intrusion event. (Doc. 113 at 226-27). And Tantum said that if SVAHA's systems are not run on at least a monthly basis—if she "just sits"—SVAHA will "go[] bad" because salt water is highly corrosive upon oxidation. (Doc. 114 at 19).